IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DONALD MCNAMARA & WENDY MCNAMARA, as trustees of the Donald and Wendy McNamara Trust, U/A DTD 10/22/04, | No. 81725-6-I |
| Appellants, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| STARSTONE US SERVICES INC, DBA STARSTONE NATIONAL INSURANCE COMPANY, a company formerly licensed to do business in the state of Washington and LONDON AVIATION UNDERWRITERS, INC., a company licensed to do business in the state of Washington, | |
| Respondents. | |

CHUN, J. — This matter concerns the McNamaras' insurance policy for their airplane. The policy excludes from coverage damages due to mechanical failure and wear and tear. Wear and tear is defined as including damage caused by heat from operation of the engine. Based on these exclusions, the insurers denied the McNamaras' claim for damage to their airplane's engine. The McNamaras sued the insurers, and the trial court granted summary judgment dismissing the action. Because no genuine issue of material fact exists that mechanical failure and heat from operation of the engine caused the damage, we affirm.

Citations and pin cites are based on the Westlaw online version of the cited material.

I. BACKGROUND

Appellant Donald McNamara landed his Piper Meridian airplane at Paine Field in Everett, Washington, and taxied back to the airplane hangar. McNamara then followed the shutdown procedure as detailed in the Pilot's Operating Handbook, including moving the engine condition lever to the cut-off/feathered position. According to McNamara, when the engine condition lever is in this position, the fuel is cut off from the engine and the propeller can fully move into the feather position. At the moment he placed the engine condition lever in the cut-off/feathered position, he observed the engine shut down as it normally does.

After McNamara finished shutting down the airplane, he realized there was an aviation database update that had been in progress during the flight. He wanted to check if the update had been completed, so he turned the battery master and avionics back on. When he looked at the engine instrumentation, he saw that the engine's Inner Turbine Temperature (ITT) was above the red line, which indicated it was beyond the maximum temperature limit. His first thought was to spool the engine to force cool air through the compressor and cool the engine down; this is called "dry motoring" the engine. As he dry motored the engine, he saw "a lot of smoke" coming from the engine exhaust. Because of the smoke, he also closed the firewall fuel valve to ensure fuel was not getting to the engine. According to McNamara, the dry motoring helped bring the ITT down into acceptable limits, and the smoke dissipated.

At the time of this incident, the McNamaras had an aircraft insurance policy with StarStone National Insurance Company ("StarStone"). The

2

McNamaras submitted a claim under this policy for the damage caused to the engine.

London Aviation Underwriters[1] wrote to the McNamaras, denying their claim. The letter explains that the claim was denied because a mechanical failure caused fuel to continue to flow into the engine after shutdown; to the extent this may have led to engine damage, the damage resulted from heat from operation of the engine.

The McNamaras, as trustees of the Donald and Wendy McNamara Trust, initiated a complaint against StarStone and London Aviation Underwriters, Inc. The McNamaras alleged that the insurers breached their contract when they denied their claim.

Both sides moved for summary judgment. The trial court denied the McNamaras' motion and granted the insurers' motion. The trial court explained:

> Here, I have to conclude that all the evidence before me is that this was caused by a mechanical failure; and, frankly, that includes evidence that was supplied by the plaintiff, as part of their motion.
>
> . . .
>
> I don't think it's disputed -- the heat came up from the engine, and it caused the damage. Whether or not the plane had landed and been shut down, and then the heat caused the damage I don't think takes it out of this exclusion.

The McNamaras appeal.

---

[1] The insurers' motion for summary judgment describes London Aviation Underwriters, Inc. as follows: "Defendant London Aviation Underwriters, Inc. is a program partner of StarStone and underwrote and issued the subject policy." We refer to StarStone and London Aviation Underwriters, Inc. collectively as "the insurers."

## II. ANALYSIS

We review de novo summary judgments.  Strauss v. Premera Blue Cross, 194 Wn.2d 296, 300, 449 P.3d 640 (2019).  "Summary judgment is appropriate when "there is no genuine issue as to any material fact . . . and the moving party is entitled to a judgment as a matter of law.'"  Id. (alteration in original) (quoting Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 522, 192 P.3d 886 (2008); CR 56(c).  We must construe all facts and inferences in favor of the nonmoving party.  Scrivener v. Clark College, 181 Wn.2d 439, 444, 334 P.3d 541 (2014).  "A genuine issue of material fact exists when reasonable minds could differ on the facts controlling the outcome of the litigation."  Dowler v. Clover Park Sch. Dist. No. 400, 172 Wn.2d 471, 484, 258 P.3d 676 (2011).

We address two provisions in the McNamaras' insurance policy with StarStone excluding certain damages or losses from coverage.  Exclusion S excludes loss or damage due to wear, tear or mechanical failure:

> The Aircraft Damage Coverage does not apply:
>
> > S. *to loss or damage due to wear, tear*, abuse, deterioration, freezing, *mechanical* or electrical *failure*, hidden or latent defect, or any combination of the foregoing causes, unless such loss or damage is the direct result of other physical damage covered by this Policy.

(Emphasis added.)

The Aircraft Turbine Engine and Auxiliary Power Unit Endorsement further defines the wear and tear provision in Exclusion S: "This endorsement explains how the 'Wear-tear' section set forth in Exclusion S. of SAV 0001 will apply to damage to turbine engines and auxiliary power units. . . . Damage caused by

4

heat from the operation of the engine or the starting of the engine is 'wear-tear' and not covered."

The McNamaras say that these provisions do not apply to their claim and thus the insurers should cover their claim. For the reasons detailed below, we disagree.

A. Grounds for denying the McNamaras' claim

The McNamaras contend that the insurers improperly raised a new ground for denying their claim in their motion for summary judgment. The McNamaras say that the letter denying their claim does not assert that the claim was denied because of the mechanical failure exclusion in Exclusion S. They assert that the letter denies the claim based only on the Aircraft Turbine Engine and Auxiliary Power Unit Endorsement because the damage was caused by heat from the operation of the engine. We disagree.

The letter from London Aviation Underwriters to the McNamaras cites both Exclusion S and the Aircraft Turbine Engine and Auxiliary Power Unit Endorsement. The letter explains that fuel continued to flow into the engine after shutdown because of a mechanical failure and that the damage was caused by heat from the operation of the engine:

### YOUR STARSTONE POLICY

Your policy of insurance with StarStone provides aircraft damage coverage subject to all the policy conditions, exclusions and endorsements. In general, in the event of direct and accidental physical damage to the aircraft, the insurer would be obligated to pay the reasonable and necessary cost to repair the aircraft. However, *exclusion S* states that this coverage does not apply to loss or damage due to wear, tear, abuse, deterioration, freezing, *mechanical* or electrical *failure*. This exclusion as applied to turbine powered

5

aircraft is further modified by *endorsement 7, the "Aircraft Turbine Engine and Auxiliary Power Unit Endorsement". It states in relevant part:*

*"Damage caused by heat from the operation of the engine or the starting of the engine is "wear tear" and not covered."*

**BASIS FOR DENIAL OF COVERAGE**

Although there appear to be various possibilities as to why fuel continued to flow into the engine after shutdown, *all appear to be the result of some mechanical failure* and not an external cause. To the extent this may have resulted in damage to the engine, that damage would have been the direct result of heat from the operation of the engine. *Based on the clear language of the exclusion as modified by the above quoted endorsement, it is our conclusion that there is no coverage under the policy for this loss.*

(Emphasis added).[2]

London Aviation Underwriters' letter to the McNamaras denying their claim specifically cited the mechanical failure exclusion in Exclusion S along with asserting that there was no coverage because the damage was caused by heat from operation of the engine. The insurers did not assert the mechanical failure exclusion in Exclusion S to deny coverage for the first time in its motion for summary judgment. Thus, the McNamaras' argument that the insurers raised a new ground fails.

B.  No genuine issue of material fact about cause of damage

The McNamaras claim that the evidence does not support the proposition that mechanical failure or heat from operation of the engine caused the engine damage at issue. We disagree. No genuine issue of material fact exists as to

---

[2] Donald McNamara appeared to understand that the letter says the claim was denied based on the mechanical failure exclusion in an email he wrote to the insurance adjuster: "I just received a letter from the underwriter denying the claim. The basis for their denial is that the fuel present during shutdown, that caused the internal fire, was due to a mechanical failure, not an external cause. They further say that the resulting damage was due to heat from operating the engine, which is excluded from coverage."

either cause of damage. The evidence in the record shows that there was a mechanical failure that allowed fuel to keep entering the still-hot engine, resulting in damage to the engine from overheating.

On the day of the incident, McNamara wrote in an email to Kevin Mead that the temperature gauge ran hot after he shut down the engine, causing him to suspect that fuel was leaking into the hot engine and burning:

> On a flight today, I noticed an issue during shutdown where, the condition lever hung up a bit right at the end of the travel in the cut-off position.
>
> The engine spooled down, but then I noticed the ITT was getting really hot, so I dry motored then [sic] engine and there was a lot of smoke, and then the ITT dropped down.
>
> I suspect there was still unburned fuel getting into the hot section when the engine was not running, and it was burning.

London Aviation Underwriters assigned Arnold & Arnold, Inc. to investigate the McNamaras' claim. In a letter, Arnold & Arnold explained in detail its conclusion that the damage was caused by mechanical failure:

> The insured states that his mechanic opines that the cause of the fuel to continue flowing after cut off is that the internal rigging governing fuel flow could have become jammed, or the fuel control unit is damaged and not functioning properly. We opine that both of these potential causes are due to mechanical failure of engine components, and are not a result of an external incident.
>
> We opine that there may be two or more other alternative causes to the continued fuel flow after shutdown. One is that the fuel dump valve did not function properly at shut down and allowed low pressure fuel to dribble through the nozzles into the engine. In order for fuel to burn properly in the engine, it must be injected at a high pressure. At shutdown, this pressure is reduced and the low-pressure fuel must be redirected away from the engine by the dump valve to present this low-pressure fuel from entering the engine. Another alternative is that the fuel purge valve did not function properly and continued to allow fuel into the engine at low pressure after shutdown. The fuel purge valve pushes the last amount of fuel into the engine after shutdown with a high-pressure jet of air to

7

ensure proper burning. If this component malfunctions, the fuel may dribble into the engine at low pressure.

It appears that there are several potential mechanical malfunctions that may have allowed fuel to flow into the engine after shut down, causing high ITT, the appearance of smoke (possibly fuel vapor), and the subsequent overheating damage. It does not appear that there was any external cause for the damage, nor was the malfunction a result of improper shutdown by the pilot.

…

**In summary**: It appears that the pilot followed proper engine shutdown procedure and that fuel continued to flow into the engine after shut down, most probably as a result of a mechanical failure. This mechanical failure and resulting continued fuel flow after shutdown appears to have been the cause of excessive engine temperature, which may have significantly damaged the engine.

**CAUSATION**
It appears that the turbine engine was overheated and damaged as a result of mechanical failure as outlined above. The exact cause will not be known until the engine has been disassembled and inspected by a mechanic.

Notably, in their complaint, the McNamaras alleged that the engine damage was caused by a control linkage failure–a mechanical failure–and heat damage: "As Plaintiff was shutting down his aircraft the engine suffered severe heat damage, most likely due to control linkage failure, and caused $233,637.52 in damages."

The McNamaras' expert, Kevin Mead, an airframe and powerplant mechanic, explained in his declaration that every time he has seen this engine fuel control malfunction, it was because of sticking and binding linkage—again, a mechanical failure—allowing fuel to enter the hot engine and leading to overheating:

In this model aircraft [the Piper Meridian] the engine condition lever is connected to the fuel control unit, and when placed in the cutoff/feathered position fuel is cutoff causing the turbine portion of the engine to spool down.

8

After the engine is cutoff, and spooling down, the normal procedure is to then turn off the battery master, at which time all engine instrumentation is also turned off.

Every time I have seen this same engine fuel control malfunction was due to sticking and binding linkage that would not allow the fuel to the engine to totally stop. The over-temp[erature] was the result of too little air being supplied by the compressor needed to cool the engine. Normally when the pilot shuts off this engine at the end of the flight he simply places the condition lever in the off position. All fuel flowing into the engine is normally cut off totally at the fuel control unit when the condition lever is pulled to off.

If unmetered fuel is still getting to the hot engine at such a low RPM there is not enough air being supplied by the compressor to stop the sudden rise in temp[erature].

The declaration of the McNamaras' expert, John Mariani, explains that a potential mechanical failure of the device that delivers fuel to the engine causes fuel to enter the hot engine and thus overheat:

If a potential mis-rigging/malfunction of the Fuel Control Unit (FCU, the device that delivers metered fuel to the engine) causes unmetered fuel to enter the hot combustion chamber of the engine (spinning down and with much reduced airflow), and thus causing the over-temperature condition, there is absolutely nothing the pilot can do to stop this condition from occurring.

In arguing for reversal, the McNamaras present an interpretation of the term "operation" in the policy's explanation of the wear-tear provision. They contend that an issue of material fact exists as to whether the airplane's engine was operating at the time the damage at issue occurred. The language at issue in the exclusion provides: "Damage caused by heat from the *operation of the engine* or the starting of the engine is 'wear-tear' and not covered." (Emphasis added.)

The terms of an insurance policy must be understood in their plain, ordinary, and popular sense. N. Pac. Ins. Co. v. Christensen, 143 Wn.2d 43, 48,

9

17 P.3d 596 (2001).  The policy does not state that the engine had to be *operating* at the time the damage was caused, but that the damage was caused by heat from the *operation* of the engine.  As detailed above, the only source of heat alleged was from the operation of the airplane's engine.  The damage was thus excluded from coverage.  Whether the engine was still operating at the moment the damage occurred is not an issue of material fact.

In sum, expert declarations, the investigation after the incident, and representations by the McNamaras themselves all show that mechanical failure and heat from operation of the engine caused the engine damage.  The record does not point to any other cause of damage to the engine.  Taking all facts and inferences in favor of the McNamaras as the nonmoving party, no genuine issue of material fact exists that mechanical failure and heat from the operation of the engine caused the damage at issue.

C. Exception preserving coverage in Exclusion S

The McNamaras contend that Exclusion S does not apply to the loss at issue because such damage falls within the exception: ". . . unless such loss or damage is the direct result of other physical damage *covered by this Policy*." (Emphasis added.)  The McNamaras say that here a mechanical failure led to a fire in the engine.  They contend that although Exclusion S excludes damage because of mechanical failure from coverage, this exception preserves coverage for damage that resulted from the fire.  We disagree.

The insurers contend on appeal that the McNamaras did not raise this issue before the trial court.  Even assuming this issue was raised to the trial

court, the exception preserving coverage in Exclusion S requires that the underlying physical damage be *covered by the policy*. As detailed in the section above, the heat from operation of the engine caused the damage at issue; this is defined as "wear-tear" and excluded from coverage by the Aircraft Turbine Engine and Auxiliary Power Unit Endorsement. The McNamaras point to no evidence that the loss at issue was caused by covered damage. Because the damage here is not otherwise covered by the policy, the case relied on by the McNamaras, Vision One, LLC v. Philadelphia Indemnity Insurance Company,[3] is not persuasive.

We affirm.

_____
Chun, J.

WE CONCUR:

_____     _____
                                     Appelwick, J.

---

[3] 174 Wn.2d 501, 514-15, 276 P.3d 300 (2012).